Good morning, everyone. As you know, our court is down two judges from our allotment of 14, so every now and then we ask for a little help from other courts, and this morning, Judge Bill Ditter of the Eastern District of Pennsylvania has agreed to give us a hand, and Judge Fischer and I want to thank Judge Ditter very much for helping us out this morning. All right. We'll call the first case, U.S. v. Fullmer and other defendants. Mr. Serkin? That's correct. Good morning. Good morning. If it pleases the court, just in general review, the argument is going to be split by myself and I'm going to be talking in general about the speech that was involved in this case and it's our position that under Brandenburg that it's all constitutionally protected free speech. Mr. Stahl will talk about some particulars as dealing with the statutory construction and Mr. Goldberger will talk about some of the conspiracy and some of the matters dealing with the faxes and emailing. The court is aware, and I'd like to reserve four minutes for our side for rebuttal. Very well. That's okay. This case really involves where we are in the modern world now that we have the Internet and websites and we can communicate with one another via the Internet as opposed to radio, television, or newspapers, or in fact, in person to person, and what happened here was that clearly this was a political campaign to bring about some social change. The social change being as it relates to the use of animals in testing pharmaceutical products and that there was a group of individuals who had gathered together that were actually the messengers, that they would carry messages on a website that did announce what their activities were and that they wanted to try to convey the message that Huntington Life Sciences was a laboratory located here in New Jersey that was using dogs, cats, monkeys, and other animals in testing various products and that they were treating them in an abusive fashion even to the extent of bashing a dog in the face and making some announcement about it. It was the position of these young people that they wanted to stop it and how they wanted to do it was a traditional American way of protest by going out and trying to create what in the past had been done in Claiborne in cases such as that is to create secondary boycotts and to encourage not only since the lab wouldn't listen to them directly, but they went around and they encouraged people to do demonstrations both at places of employment and places where people lived. They were all generally, they were most often were peaceful demonstrations. Many of them, the demonstrations that had imposed civil injunctions had been secured by Huntington Life Sciences or in fact by some of these companies that were being boycotted or asked to boycott Huntington Life Sciences and they attempted in most instances to control whatever crowds were there and by making sure that the injunctions were complied with. As it turned out, many of the people who were the recipients of demonstrations found themselves were just bothered by the demonstrations and didn't like the idea that people were out there. Many of the targets that were designated to where the particular demonstration would take place would in advance not even know that people were coming, they didn't know, nobody had sent from shack had sent anything that said there's going to be a protest at your house. There was a message on this website that indicated that there would be a particular demonstration on a particular day and how these people reflected that may have been imposed and conveyed to them via messengers from Huntington Life Sciences that tried to exaggerate and to discourage people from following what shack had to say. There seems to be a lot more than that though, Mr. Serkin. In reading the record, I note that there were acts of specific physical intimidation where rocks and stones were thrown at property through windows, where cars were overturned, where specific... There were things like that that happened. I'm going to counterpose that with your beginning statement that this was traditional American protest. Again, it's not different than... Some of that did happen, but whatever happens in demonstrations, demonstrations start out. In the past, labor unions, when they would gather together and they would have demonstrations or they would picket, there may be an individual who goes too far. If that individual has gone too far, that individual should be prosecuted for violating the law. Those are criminal acts. Do you think that posting the family of persons who were involved with Huntington Life Sciences, their home address, the age of their children and where their children go to school, do you think that's an accepted manner of protest? The purpose of doing that was not to intimidate or instill the idea that we're going to create the fear of serious bodily harm or death. The reason for that is to say we're going to out you. We want people to know that you are doing business with or you work at a business that does the following activity. What they were trying to do, and again, they didn't convey direct threats. All our clients did is they posted, you know, after incidences occurred or the protest occurred that a protest did occur. The writing may not have been pleasant, but not all writing about things are always pleasant. That doesn't mean it incited anybody to immediately act that way and that this type of activity was completely covered by the Supreme Court in Brandenburg, where the idea of I can write things, I can advance, you know, criminal behavior in the future as long as I don't incite one to act now immediately. Would it be a purpose to threaten and to intimidate those who are associated with HLS? If I directly communicate with them, but I did not. In general, they were not directly communicating. The website indicated that something may occur. The way that they knew it was is that people from Huntington Life Sciences said, called and let people know. They called Marsh, they called their employees, they said there's going to be demonstrations by this group, this is what's going to happen. They didn't convey it. I didn't send the message. The message only said that there would be a demonstration that would be taking place. They never said, they did say that we do accept direct action to convey our message if it happens. But they didn't say this is what you have to do. They didn't incite that. People had the time to reflect on how they were going to act. There were a multiplicity of demonstrations of which there weren't problems. They were annoying to people, but again, because a few individuals in a group, you don't shut down the press because somebody misinterprets it or somebody acts contrary to what the message was. You don't kill the messenger. And I think this is what's happened here. They've gone after a messenger. They've created a theory here that is contrary to what has been provided, is protected free speech in Brandenburg. It's no different again than the threats that were made in Claiborne. Is your argument on the free speech aspects of this challenge more related to the Animal Enterprise Protection Act than it is to the Stalking Counts? Now, I believe it also applies to the Stalking Counts because the Stalking Counts would have been what people said or did outside was an individual act. The spilling of paint on somebody's porch or somebody saying something, whatever. That's a spontaneous. There's a lot of political hyperbole that people are allowed to say. Mr. Serkin, isn't it permissible to use the words that have been uttered by the conspirators and by the organization circumstantially to support the evidence for the Stalking Counts? I don't believe that it is because, again, those who are communicating to the- Under any set of circumstances? I think under any- Unless it immediately incites one to go do it, I believe that it would. It would violate the law, but it's not here. I don't think that when you're dealing with First Amendment, I don't think it's really appropriate to put them in together and claim a conspiracy because then every association that forms to get a political protest or that encourages civil disobedience, it's happened in the Civil Rights Movement in the 70s of encouraging people to sit in the front of the bus or at the counters and so on, would be then, would be in a conspiracy to violate the law and would be guilty of violating conspiracy to commit various crimes. If particular individuals go too far, they're the ones that should be held responsible. Again, not a person that put something out there that's political hyperbole. It's no different than Charles ever saying, you know, anybody that crosses the picket line, I'll break their necks. You know, that's directly, that's saying an act of violence. That's political hyperbole. I don't think that is being a direct threat. They put the names of people in the publication in Claiborne. Mr. Storkin, it doesn't seem like nine minutes, but your time is up. It is, and I'll pass the torch. Your time is up for quite a while. Thank you very much, Mr. Storkin. Mr. Stahl. Thank you. Good morning, Mr. Judge. I'd like to follow up, Judge Fuentes, with your question. In addition to the First Amendment defenses, what we have here is an insufficiency of the evidence, and I think that is highlighted most effectively by the 2006 Amendment. The appellants were prosecuted under the 2002 EPA, and that statute was simply uses interstate commerce for the purpose of causing physical disruption to the functioning of the animal enterprise and intentionally damages or causes the loss of any property, including animals or records used by the animal enterprise. And what we have here is the government chose to indict this case in such a way and then present the evidence in such a way that ignored that aspect and focused rather on the secondary targets, such as the acts of violence that you're talking about, Judge Fuentes. Well, wasn't there any evidence of damage and the value of the property that was damaged? There was evidence, great evidence, great volume of evidence from various witnesses about the secondary targets, and the government indicted it as one of the objects of the EPA conspiracy was to shut down HLS through the secondary boycotts, the secondary tertiary targets. And so witness after witness spoke about demonstrations, both where there was injunctions in place and ones that were not. Well, the statute specifically refers to property of the enterprise. Of the animal enterprise, yes, which would be HLS itself. However, the vast majority of the evidence in the trial record was through witnesses, including the stalking alleged victims by – they're all secondary targets. They were from Marsh, the insurer, Stevens, the financial backer, and very little about HLS itself. Okay, well, your argument is that the evidence was insufficient, but what aspects of the statute – what elements of the statute were not established through confident evidence? Your Honor, I think that what happened here is that the original statute, No. 2, was geared towards the typical demonstrations and interference, physical disruption of the physical location of the animal enterprise. Thus, when you look at the language of the statute itself and the legislative history, it dealt with individuals that would go and break into these facilities, liberate the animals, destroy the testing records and the animal records. In 2006, the statute was widely amended to cover almost the specific acts that the government chose to present during the trial below. And that was targeting of secondary tertiary targets to put financial pressure on the animal enterprise. Yes, but what about the – what about the destruction of the electronic assets? I mean, the computers, the phones, the faxes – isn't that sufficient under the 2002 statute? Forget the secondary targets for a second. And, you know, you could argue that perhaps the government was trying to establish disruption, physical disruption, by proof of the secondary targets, or you could say that that evidence related more to the stocking count. But if, in fact, the physical disruption of the electronic assets was shown, and, you know, we – there's a very – we're at a very deferential stage as to whether or not any reasonable jury could have found sufficient evidence here beyond a reasonable doubt. Wasn't that enough in and of itself? I think there's several issues with that question, Jeff. And I know it was multifaceted. One, before I move exactly to that question, would be that the government not only presented in their opening, their summation, and their arguments to the judge in pretrial motions that it was the targeting of trying to shut down HLS and the secondary targets that was their theory of loss in this case. So they did more than try to present it as an overview of the conspiracy or towards the stocking. But to move directly to your question is that with that theory in mind, in pretrial motions, the defense constantly asked for a bill of particulars or what the government was going to present as proof of direct physical disruption. But they argued they weren't entitled to one. They argued that it wasn't necessary because their theory of the case was that they were – that this group, SHAC, was trying to shut down HLS and that that would be the ultimate physical disruption. So that they would not have to specify what physical disruption there was to HLS in particular. And by that, we believe that that is akin to a bill of particulars and that they should be prohibited from proceeding with that evidence. But wasn't there evidence of the disruption of the fax facilities as well as the computer servers? Through Mr. Michelson, there was brief testimony about many things, including the legal costs associated with getting injunctions and things that would not fall under typical law. But wasn't that sufficient to establish a disruption element? He said in a general term that there was X amount – something like $40,000 used to get their computers back up and running. Now, the question is, is that a physical disruption under the 2002 EPA? And we argue that it's not. The physical disruption under the 2002 statute was interrupting their physical plant by breaking in, by protesting, by preventing people from entering, by disrupting their experiments. What we're talking about is an overloading of a computer system, perhaps through sending emails. Not sending a virus, but communicating, which we believe under Mr. Sirkin's First Amendment argument is protected speech, but communicating with the company and sending emails. And if that overloaded their system, is that a physical disruption under the 2002 statute? And we don't believe that that is what was intended by that statute. Now, clearly, the 2006 amendments went much further in the explanation of what is the statute. What are we trying to cover under this? Well, the mere fact that the 2006 amendments maybe were more specific doesn't mean that the 2002 language didn't include what the 2006 amendments specified. That's correct, but we cannot presume that there is a direct A to B link. I think that when you look at – although the legislative history is not bonding on the Court, I think it certainly helps explain what was looked at, and that the 2006 was a drastic expansion, not just a clarification, Your Honor, of explaining what was meant by the 2002 statute. Because when you look at the stalking counts, we've charged under federal stalking, which is a very specific statute that requires specific intent by the speaker to create reasonable fear of death or serious bodily injury, which is explained in the statutes, and a reasonable interpretation by the listener. It's a very specific statute. There's probably no doubt that the comments that were made were intended to annoy and harass, but those – those other statutes, particularly state statutes, cover those, and they're usually misdemeanors or disorderly persons. There's no intent here, and there's no evidence of specific intent by any of the defendants to cause fear of death or serious bodily injury as defined in the statutes. But was there not evidence of intent to cause physical disruption of the property of the enterprise? Don't believe that there was evidence in the record that the people that were on trial intended to cause physical disruption of the HLS, the Animal Enterprise Facility itself under the OQ statute. It just seemed in reading the emails that that is precisely what the group wanted to do. The email suggested – in fact, the emails informed whoever wanted to read it exactly how to disrupt the fax facilities as well as the computers. Judge, again, I believe that that goes back to how do we interpret physical disruption under the statute that these people were charged with? And in this modern day and age, is sending – in times before the internet, is sending massive amounts of mail that requires staff to open it, to unload it, to read it, to stand outside in protest, to write articles, is that any different than sending emails that because their computer system could not handle that? Is that the physical disruption that Congress was getting at in the 2002 statute? As opposed to what it clearly appears to be is an actual physical taking of the property, destroying of their property, as opposed to communications that one of the byproducts of the overload of communications was that it caused something to happen with their computer system. There's no testimony on the record what exactly happened. Your argument would be stronger if the statute said physical damage. But physical disruption, why wouldn't interfering with the operations of one's phones, faxes and computers come within the scope of the term physical disruption? It certainly was disruptive. Well, it says physical disruption and intentionally damages or causes loss of property and, not or, so I believe that it has to be coupled together with that. And I think that's where the government fails under the 2002 version. Under the 2006, it may be covered. Your argument is that the evidence was insufficient as to all six individual defendants? Yes, Your Honor. Including the two, Conroy and Fulmer, who were more actively involved in the computer aspects of the protest group? Yes, Your Honor. Okay. And that's on the Animal Enterprise Protection Act? That's correct. Are you, I know you have co-counsel who's going to, who's going to talk about the stocking count? Mr. Goldberger. I was going to talk about the stocking. Mr. Goldberger. No. Mr. Stone, I have a question. We talked about specific intent. What was the specific, what was the reason for saying that such and such a child goes to such and such a school and these are that child's extracurricular activities? What was the intent there? Your Honor, this was... How far that parent is concerned. Your Honor, there's no doubt... You have it already? I do, Your Honor. I do. And there's no doubt that in certain protest situations and political actions and people coming from the best of intentions, there's some things that are done that are distasteful to outsiders and to the people that's involved in. That was a product of the name and shame game. And that was to out the businesses doing business with the animal enterprise. And to shame them and their workers into saying, we do not want to do business with an enterprise that harms and kills and abuses animals. And to affect that goal, individuals that were associated with those secondary tertiary companies, they were named. And their locations, where they work, sometimes their home. And on rare occasions, there was an instance where the children went out. And I think that that intent was to further shame those individuals. What was the intent? Was to out those individuals in the community. By doing what? By causing them and their neighbors and the people in their community to understand that these individuals and the companies that they represented were doing business with an abhorrent company that was abusing animals. And in that... Wasn't the intent to create fear? I don't believe... For your child? I don't believe so, Your Honor. I do not believe there was evidence in the record. Nothing happened. There was no protest at the schools. Nothing happened to the children. No child was approached. There was demonstrations at these individuals' offices and their homes. Yeah, but what other purpose would there be in publishing the children's names if it wasn't to place fear in the minds and the hearts of their parents who were somehow connected to HLS? And isn't that all that needs to be proved in the Stalking Council? No, I believe that there has to be, Your Honor, a specific intent by the speaker and the reasonable perception of the listener, and it must be for death or serious bodily injury, which is a very high threshold. Wasn't it reasonable for the parents to hold a fear of death or serious bodily injury for their children? Over the protests? In light of everything that had gone on, and then all of a sudden their children's names in schools are published over the Internet? Judge, when you say, in light of everything that went on, there were acts of vandalism, there were acts of annoyance, there were acts of protests. There were time, place, and manner restrictions during some of these. During some of the incidents the government brought out with an individual defendant screaming at a homeowner, there's a police officer standing right next to that individual in the videotape that was presented. What we have are acts of annoyance, inconvenience, and... How do you distinguish that from fear? Well, Judge, no individual was hurt during this. But that's not the test. And no individual could, I would submit to you, no individual could reasonably believe that they were targeted for acts of violence. Acts of violence were not condoned. Wasn't there an individual who was so intimidated over the course of time that she had to sell her house and move out of the neighborhood? I mean, when you say no one was hurt, that sounds to me like somebody was hurt quite badly. Well, Judge, hurt in the sense of emotional distress is not covered under the federal stalking statute. Emotional distress may be covered now under the 2006 amendment to the EPA, which I think explains further that the 2002 act did not cover this. But emotional distress, where you are embarrassed in your neighborhood, or you do not want to drive through picketers every day, or you do not want to come home and find people in front of your house, or posters hung up on telephone poles, is different than being reasonably in fear of death or serious vital injury, which includes maiming, loss of a limb, very extreme acts of violence. Mr. Stoll, I don't know how much time you have remaining. I thought your time had run over. Subtract the five minutes for Mr. Goldberg. Okay. But I do want you to address, if you can, briefly, the statutory, the constitutionality of the statute. I see it's noted for you, statutory. Is it statutory constitutionality or construction? Construction. Construction. Well, if we're going to constitutionality, I would defer to Mr. Serkin. All right. Or Mr. Goldberg. All right. Let's go on then. We maybe have a few more minutes. Yeah. Maybe from Mr. Serkin. I just want the best. Are you finished, Mr. Stoll? I am, Your Honor, if you're moving on to the constitutionality of the statute. Thank you, Mr. Stoll. Thank you. Yes. I thought you started down that road, but I thought you might just give us your best argument on why the statute is unconstitutional. In relation to the AEPA was the statutory one that we were attacking as being both vague and overbroad. I think the term physical disruption, what it really means, is vague. One would not really know. Physical, the example I would use, if I go and I'm intimidating, in a sense, the punter, and as a result, he kicks a bad punt, there's been no physical contact. I've not entered into it. It becomes a personal foul when I actually come up to him. And I think that the physical disruption would mean really coming onto the plant, cutting a fence, grabbing the fax machine, breaking it, physically there, this contemplated idea of something that goes through an email because too many get sent there or too many faxes come in and cause some damage to the property that way. I don't believe... It's not just physical disruption. It's physical disruption of the facility by intentionally stealing or damaging property in excess of $10,000. There's several elements that seem to at least limit the statute's application. But again, physical disruption means physically being there, doing it, and stopping. It's the way I would interpret it. I think it's overbroad. The statute itself is overbroad because the only affirmative defense is I'm allowed to publish information of what may be going on in the lab. Isn't that something that we typically leave to juries to decide? I think on an overbreath, if it silences and has a chilling effect on free speech, it crosses the line if it affects a substantial amount of protected speech. And here, this speech, political activity, this is purely political speech and expression. And I think it puts a chill to say, you know, loss of profits or you disrupt my business. The purpose of the demonstrations was to put them out of business. That's legitimate. Isn't your overbreath argument mooted by the 2006 amendment? It may be mooted in the future, but it's not mooted to our clients. There are cases that have held to the contrary. But I think that it would be unfair to say, and then I think I'm being ex post facto, and I think it would be... No, you're challenging the statute, and the Congress has already changed the statute. I think that then is a contention that the statute was overbroad at the time, and that it was unconstitutional. Isn't it a facial challenge? Yes. You didn't really develop an applied challenge on overbreath. No, we basically made a facial challenge on it, that it could chill a substantial amount of protected speech. And that's a constitutional argument. The Supreme Court recently decided the Williams case, in which the court essentially said it disfavors overbreath challenges in favor of as-applied challenges. Can you comment on that? I understand that. But again, in the Free Speech Coalition case, Ashcroft, they said it was substantially overbroad. Is there any reason why an as-applied challenge can't be made? Well, it could be. I mean, it's the same here. And again, it does affect, you know, protected speech. Mr. Goldberg. Mr. Goldberg? It was my intention to address the count six, the Black Facts conspiracy, but it fits right into the pattern of what we've been talking about. Black Facts was an illegal tactic that was described, even recommended, in the context of this wider moral, social, and political campaign against HLS. The government never proved that there was a specific criminal conspiracy as charged in count six to agree on and plan actions in violation of the Telecommunications Act. This conspiracy is an important one. It doesn't just sort of ride under the others because of an anomaly in the way the statute's written. It has a three-year maximum, but the conspiracy to violate it, because it's not a misdemeanor, has a five-year maximum. The heaviest sentences were imposed on this count. All the charges, by the way, on all the counts against all of these six defendants are based on a theory, one or another theory of vicarious liability. Not one of these defendants is charged with having stalked anyone, with having sent the Black Facts. Josh Harper, my client, two conspiracy counts only. Even the stalking counts are aiding and abetting counts, and the theory, the government's theory of conspiracy and abetting and abetting against all of them, and in particular on count six that I'm focusing on now, was the improper treating of the political campaign as the political, as the criminal conspiracy. Just reflecting back on Jeff Fisher's question, I'm not sure that Mr. Stahl gave the answer that we would give to that question about the evidence. I'm not saying the evidence is inadmissible. Evidence, yes, of what they said is circumstantial evidence. The point is that the jury was not instructed and the government's argument and theory of this whole case failed to apply the strictest knee-jurist First Amendment principle, which applies when protected and unprotected conduct, that is speech and crime, are together interwoven as tactics for the advancement of a social purpose. This is not a new problem in the animal rights movement. This is something which came up in the Smith Act cases in the 50s, it came up in the civil rights cases in the 60s, it came up in the anti-war cases in the 70s, and there's a body of law on it that we discuss in our brief which the government's theory completely obliterates, and the jury instructions in this case failed to protect our clients. What was the problem with the jury instructions? It seems to me in listening to you speak that this is really the essence of the defense at trial, that the conduct was perfectly legitimate protest, constitutionally protected speech. But I would say that there was, as you're pointing out, because there was plentiful evidence of improper and illegal and outrageous conduct by certain individuals, not by these defendants, which came in because of the nature of a conspiracy trial. The First Amendment required a much higher level of protection to see that the jury could not convict them for joining a group and calling it a conspiracy because within the larger umbrella of that cause and that group and that pattern was included some illegal activity, illegal activity which was described and discussed and even praised on the group's website in a way which, to hearken back to the very beginning of Mr. Serkin's argument, never across the line drawn by the Supreme Court in Brandenburg. It's not just legal and illegal conduct, it's protected and illegal conduct that makes these cases so hard. That defense applies also to this Count Six Facts conspiracy where my client is accused of having made, in terms of his own conduct, two speeches, a workshop and one speech in which among other things he describes and praises the use of black faxes. No evidence of a criminal agreement in the nature of a conspiracy among these defendants to advocate the commission of that crime that is in any way separated or the jury could on this record have separated from the political speech that fell short of prohibited incitement. Mr. Goldberger, I want to ask you one specific question about the jury instructions on the count that you addressed, Count Six. Sure. And I would actually preface that, commend all of you for the utilization of Rule 28i of the appellate rules. We could have done better on that. You could have done better but you've done better than a lot of other people who've done with multiple defendants. Appreciate that. So, and obviously there's a lot in your briefs and I'll take those as well as your arguments under consideration in deciding this case. But on this specific point, somebody made the argument, I believe, that the jury instructions broadened the charge not only from faxes to telephone calls. Do you want to comment on that? Yes, I would love to. That's my brief actually. Okay. The only brief that discussed Count Six. First of all, the indictment completely omitted one of the elements of the offense and the jury instruction echoed the indictment in omitting the elements that the communications have been in interstate communications. So, for example, and that's not just a theoretical question because just again to take my client, Mr. Harper, gives this workshop in Seattle and he talks about the use of the black fax tactic in relation to a local campaign by a local group which is not the National Shack Group and is not the website. Those, the faxes that a jury could have found if they had known that this was an element, that he was talking about faxes that would not cross a state line. Then he goes to Little Rock, Arkansas, and he gives a speech in Little Rock about the campaign against the Stevens Company, a secondary target of the campaign, which is a, Arkansas, that's why they're in Little Rock, because they're a Little Rock company, and he advocates and praises and talks about black faxing. Again, could be understood to be local, not interstate. So, first, that element's missing. Second, you have the broadening problem, the constructive amendment. The indictment charged only a conspiracy to use a telecommunications device. The statute talks about using, to harass, a telecommunications device over a telephone. So the statute draws a distinction between telephones and other devices which communicate. And it was understood by the defendants, as I threw out, the record reflects that this was a conspiracy to use fax machines to harass, that is to send continuous streams of mess through a fax machine instead of communicating. And yet, under the jury instructions, the jury was told they could convict under this statute, and which had the indictment covered that they could have, harassing by making telephone calls. There was evidence of telephone calls that the jury could have taken as harassing. There was evidence the jury could have taken as a conspiracy to make telephone calls to harass. So there was clearly the possibility of prejudice. Okay, I understand your point. And so you have a constructive amendment covering an area of the statute which was not charged in the indictment. That's an automatic reversal on count six under this court's cases. Thank you, Mr. Goldberger. Thank you very much, Judge. Some more, Marco? Good morning, Your Honors. Obviously there's a lot here, and I'm happy to address whatever the court is most interested in. But I guess I'll start at the beginning with Mr. Serkin's argument, which is premised, it seems to me, pretty much on Brandenburg. And this court held in United States v. Bell that Brandenburg does not apply to unlawful speech acts. And it cited things like aiding and abetting, extortion, criminal solicitation, conspiracy. But I don't fundamentally disagree with a lot of the thrust of what Mr. Serkin was saying. In terms of you have to look and see what the thrust of this whole campaign was, Mr. Serkin and I just disagree about what the facts showed here. And the jury certainly concluded that these people were not the mere messengers of someone else's statement, that when you look at this record as a whole, it's pretty clear that this is a plan that these defendants pretty much, at least the lead defendants, pretty much devised that Mr. Kajonas, Ms. Gozola, Mr. Conroy are the leaders of CHAC and that their plan is to engage in unlawful direct action. And that's really the niche that CHAC serves in the animal rights movement. That's how they advertise themselves. That's what all their literature says. And so the question of whether or not these were sort of isolated acts by other people that they had no control over and that they didn't endorse, I mean, this is a very, very different case from NAACP v. Claiborne. I mean, that case really turned on the fact that the Supreme Court stated that there was no evidence that the NAACP condoned individual acts of violence that may have been committed over the course of this. And they were looking at the NAACP, as we all understand it, as the nation's premier civil rights organization. But if there had been evidence like there was here, for example, if you look at Ms. Gozola's radio interview, which I would argue is tantamount to a confession to some of these crimes, she describes, she's speaking as a spokesperson for CHAC, and she's talking about what we approve of. And so in that speech she says, and let me just open to some of it. I don't want to make a mistake. Okay. We support property destruction in order to close this place down as soon as possible. We support illegal action. We support home demonstrations and economic sabotage. She explains that this is the most successful campaign in animal rights history. The reason, she says, is because they're not being bound by the law, that they're taking matters into their own hands. She said people are tired of just standing around and waving placards and holding up posters and having nobody agree with them. It's when actions like this occur that we actually get results. And you can see throughout the phone calls, throughout all the discussions, they're crowing about. Is that interview evidence against her or against CHAC? It's evidence against both. It shows her intent. And she, as CHAC, she's the campaign coordinator for CHAC. It's her resume indicates. So it obviously is for both. But it also tends to show, I think, the motivation of really all the people in this group. It sounds like a call to action. But you know, if Mr. Serkin is right, I think you lose all around, don't you? Well, actually, the judge instructed the jury here that the First Amendment argument only applies to count one. Now, the defendants objected at the end of trial and said it should apply also to count six. Count six was the stalking? No, count six was the telecommunications. There was actually no objection at the end of the trial saying that it should apply to the stalking. And I think that's in light with Judge Fischer's question earlier, which is, you know, if you meet the statutory criteria for stalking, it clearly isn't First Amendment protected speech. And that is how Judge Thompson instructed the jury here. And at the very end of her charge, she said, you know, are there any objections to the instruction as given? And their objection at that time was we think the First Amendment should also apply to count six. So it was really sort of off the table for the stalking counts. And there had been some discussion about it earlier, but she specifically said, I need you to object now because I've rewritten a lot of the charge in response to your objections. So, you know, speak now or forever hold your peace. Now, I do want to also point out this question of, you know, death or serious bodily injury, you know, and whether or not it was reasonable for these individuals to fear that. I'm going to just cite one thing from the website. It's at page 1308 in the appendix, and it's directed to the Marsh employees and the three stalking victims that were individually charged were all Marsh employees. And on the website it said this, and it was directed to the Marsh employees. It said, Marsh employees, double colon, we know where you work. We know where you eat. We know where you sleep. Is HLS really worth it? We will treat Marsh no differently than we would treat Brian Kass. Brian Kass, of course, was the person who was hit over the head with a pickaxe. So if there's any question about whether or not there was an intent to place these individuals in fear of serious bodily injury, I think that statement alone should do it. And obviously the statements against young children speak for themselves as any parent would realize. Where was that communicated? Where was that statement communicated? The one I just read or the children? The one you just read. That was on the website. But at one point they seemed to be trying to argue that because we didn't e-mail it to them directly, that somehow we didn't disseminate this. Again, this is a statement that in its own terms is directed to the Marsh employees. We know where you live. We know where you work. There are numerous examples of this. There was the very distasteful one where there was someone auctioning off the underwear of a HLS worker, and they addressed her directly on the website. I won't go into exactly what they said, but they were addressing her directly and really threatening to send whoever bought this underwear off the website to her home in something that would be very certain. So was it enough to put it on the website without showing that it was disseminated through e-mail communication? Certainly, Your Honor. Anyone here would know that these individuals were going to go to the website. You have one of the victims, Rob Harper, saying he was obsessed with the website. He spent hours on it every day. He was afraid of what was going to happen, and this is how they were communicating. This was a mode of the conspiracy. Was there testimony that the people to whom this was directed actually accessed the website? Yes, Marsh employees. All three of the victims were Marsh employees. Was there testimony that they saw that communication on the website? Well, I don't know if they saw that particular one. I can definitely say that Rob Harper testified that he was aware of the Brian Cass incident, or at least what he said was, I was afraid I was going to get hit on the head with a pickaxe like somebody else had been. So I don't think he remembered Brian Cass' name, but he was aware of the incident. How do you distinguish between these being true threats and, I don't know, protest statements? Well, the question is, what is the intent here? I mean, that's what you have to get down to, and that certainly is a jury question. I think when you look at the wealth of evidence here, you look at some of the Shack newsletters, and they specifically talk about, again, Shack's role here, and they don't talk about education. They say that this is effective because they're able to sort of convince people to back down because it's not really worth all the fear and danger that it's causing to people. I'm trying to think. Yeah. Okay. They have 2001, a year in HLS, and they list all the accomplishments of what they've done in the campaign against HLS, and the majority of them are illegal actions. They're liberating 14 Beagles. They're smashing car windows. They're evacuating five city blocks in Seattle. They're repasting. There are Internet attacks. There's sinking a yacht. There are stink bombs. There's vandalism. This is the kind of stuff that they're glorifying on the website every day. When you go to their website, they're listing the names and addresses of individuals, which is frightening enough, but they're listing them next to pictures of overturned cars. They're listing them in such a way that anybody would be fearful that these sorts of things are going to happen to them, and then they're trying to walk away from that responsibility. They're using the website as a tool to instill fear in people. They can't guarantee that anyone's going to go to it, but I think a reasonable person would assume that if you knew you were being targeted by the shack, one of the first things you would do is find out who they are and find out as much as you could about what was going on. You would almost certainly go to their website, and you would then see your name next to acts of violence, and they would hopefully not have your home number and have where your children go to school or have what your route to work may or may not be. But that's the kind of thing that obviously would place them. Mr. Moore and Mark, let's turn to the AEPA, the statute, the 2002 statute, the one that they were charged under. And the question is about the sufficiency of the evidence for the individual defendants. You will agree, I'm sure, that in order to violate AEPA, there had to be evidence that was offered against the specific individual defendants as to one of the elements, which would be a violation that's used in this talk about physical disruption. You know, what's your best evidence against the various defendants? Well, let me also start off by... I've looked at the record fairly closely, not as closely as you have and others who have lived with us. But as to certain of the defendants, I'm not sure that I have found enough physical disruption. And if that's the case, is that fatal? I don't think so. Can I take a step back and say how the government tried to prove this case primarily? What we first tried to establish was that there was a conspiracy to disrupt this organization, to also cause physical damage, and that it was to be done through illegal means, that in order to draw these people into the conspiracy, because I think everyone agreed at the opening statements that the goal of this conspiracy was to shut HLS down. That really wasn't in dispute, and to cause as much damage as they could. What was in dispute was whether or not these people shared the illegal, the desire of Shaq to do it through illegal as well as legal means. So what we were trying to do is draw people into the conspiracy by showing that they weren't just peacefully protesting, that they were actually embracing the illegal portion of the scheme. So I don't think we necessarily needed to show, because co-conspirators are responsible for all the acts of their other conspirators, even if they don't know them. Like one conspirator may have been responsible for the destruction of the computers, but if the other people joined the conspiracy knowing its overall objective, they could still be liable under the conspiracy theory. They don't have to know each particular act. So in that regard, what we showed was that Conroy in particular was the, I call him the computer guy, the information technology guy, responsible for the website, responsible for doing a lot of that. But clearly if you look at Shaq, it's the main participant here. They're advertising the Black Facts Mondays. They're advertising in two particular computers. I guess in essence though, accepting is true everything you said. In essence, don't you at least have to show that the individual defendants embraced some illegal means to carry out this conspiracy? Absolutely, yes. Okay. Now, I mean I can, you want me to start with the harder ones or the easier ones? Let's start with Gazzola. Gazzola is one of the easy ones. I mean, as I said, her speech is a confession. I mean, when you look at her speech, she said, we support property destruction. We support illegal action. We support economic sabotage. She's talking about Shaq and her organization, and she's saying these are the means we use that differentiate us from other groups. And that is enough just to say we support these things? Well, the question is what's in her mind? I mean, she's one of the generals here. She's one of the people who's running Shaq, and this is a prominent part of Shaq's modus operandi. So, you know, if she gave this statement to an FBI agent as a true confession, I don't think this court would have any problems saying, yeah, okay. She admitted what we're looking for. She gave it in an open interview over the television station, over the radio station, and she said, you know, this is what I believe. What about Kajonas? Well, Kajonas was also – I mean, he was the president of Shaq. He gave a speech in Little Rock explaining the recipe for activism, and he explained the whole theory behind what Shaq was doing, which was, you know, throwing rocks on the roof of the building in order to get – But is that enough without specific proof that Kajonas said, tomorrow we're going to throw rocks in the building and have that, in fact, happen? Well, again, it's important. Isn't that the crux of the argument here? Isn't this the crux of the argument on sufficiency of the evidence counts, at least? Yes. I mean, each person in a conspiracy serves a different role. What we showed through abundant evidence was that Kajonas, Conroy, and Gazzola were the leaders of this organization, and they could not be unaware of what this organization was doing given, you know, given their integral involvement. They're the ones who pick up the phones. They're the ones who do everything. Isn't the real problem here that, at least as to count one, you were trying to fit this conduct into the statute that you had at the time, the 2002 AEPA, and the question is whether or not it fits into that statute. Isn't that really the issue here? Yeah, I mean, no question about that. Well, you had a struggle with that. In fact, that struggle was difficult enough that someone from your office, I'm not sure whether it was you or whether it was the United States Attorney, actually testified before Congress as they were developing the 2006 statute. Yes, there were actually people from other districts. It was not your office. Okay. Actually, I mean, you know, we went forward with this statute, and, you know, I appreciate what you're saying about, you know, we tried to get everything. What we did, though, and I think what we did appropriately, was for some of the stuff that didn't fit, we charged it as stalking. I mean, we didn't charge – the jury was never instructed that damages against third parties, you know, could be part of the AEPA violation. They were intimidating third parties to try to drive HLS out of business, so it showed their intent, and it certainly – all that was evidence about stalking. But the instructions were clear on what had to be shown in regards to liability under the AEPA. Look, we were trying very hard, obviously, to show economic damage, to show physical destruction, but I do think that all these conspirators understood, as – if you just go through the website and the SHAC newsletters, they're explaining that what our role in the animal rights community is, we're not the nice guys. We're not the good guys. We're not the feel-good guys. We're the – we're no apologies. We do what has to be done in order to take this place down. And so people who were in leadership positions there certainly knew about the goals. And, for example, here's another thing that was – again, a conspiracy doesn't have to be successful. They put on their website a layout of the facility, and they started talking about – there had been 14 beagles that were liberated from – stolen from the laboratory. And, again, on their website, so they say, you know, support the heroes of April 11, which is, I guess, when it happened. And then they provided the blueprints for how you could do it yourself. It was something they were clearly, you know, trying to get other people to do part of their scheme to shut down HLS. There's no reason to include the blueprints of the business unless you're trying to help people break in. They were pointing out where the animals were kept on the map in different places. So it was clearly trying to reach property destruction. And, again, for individuals, I mean, there is certainly – I'll talk about Mr. Former, who I think is the toughest case. You know, and the question really is, was he someone who, again, just sort of shared their goals, which they all admitted they shared the goal of closing HLS, but did he embrace the illegal means? And there wasn't a ton of evidence about this, to be perfectly frank, but there was sufficient evidence. What you have from Mr. Former, he was the leader of the Animal Defense League in New Jersey. And there are a series of emails where he says, basically, we're interested in the fur trade, but we're going to get involved in the shack campaign, and we're going to start showing up at demonstrations every Friday. But then he embraces the illegal black fax part of the conspiracy, and he sends out an email to all of his members and announces all the different black fax Mondays with specific dates and specific times. And so he says, you know, black fax Monday campaign against Warren Stevens all day on September 3, 2001. He provides the fax number. You know, then he advertises the black fax Mondays for three or four different things, and that's his embrace of not just the legal protest that Shaq is engaged in, but the property destruction that Shaq is engaged in. And I think that one document is sufficient evidence to say that, you know, he's part of this conspiracy knowing they're not going to just stand on the sidelines and engage in First Amendment-protected activity. He is listed as the national HLS coordinator on the Shaq website. He did agree, and this is one of the main ways that they try to escape liability, and to some extent it was effective. One of the things that this organization does is when it does something, it tries to put it in somebody else's name. So there's a conversation between Mr. Cojones and Mr. Fulmer. I'm trying to remember if it was email or phone now. It's not sticking out of my mind. But it's Exhibit 8021 where they agreed to put the Animal Defense League's name on an activity that Shaq is clearly planning. And Cojones is explaining, we're trying to pretend we're just an organization that communicates ideas. So we can't be involved here. Can I use, you know, your ADL New Jersey as a cover? And Fulmer says, fine, no problem. So, I mean, he's also discussing targets with Kozola. He's researching companies. But he was the one, I think, when you read the Rule 29 transcript, that Judge Thompson kind of struggled with a little. She was saying, you know, is the evidence a little bit close on Fulmer? To some extent on Stepanian as well. Those were the two she seemed to be most concerned with to sort of suggest were they really, you know, what did the government have there? And on Mr. Stepanian, what we had was his leadership position in the state of New York. There are conversations between Stepanian and Cojones when they're discussing sort of three days of action in New Jersey. And what was telling was there was a point where Stepanian just stops talking and says, I can't say that over the phone. And it was pretty clear from, again, other evidence that they were using this program PGP to discuss things when they were going into their illegal mode. And so, yeah, so they had to continue that conversation. He also had conversations where he was, again, suggesting the use of phony names, the coalition to smash HLS for New York or something. It doesn't have to be Shaq, he said. But it was clear that, you know, this was something that Shaq was doing. The jury also saw Mr. Stepanian at Perna's home. They got to see a video. He actually pled guilty to his conduct there, which was also before the jury at the time. So he's screaming, banging on her door. He's in violation of a court order. So he's clearly embracing the use of illegal tactics there. He also bragged about breaking into Deloitte & Touche, which was one of the targets of the campaign. He snuck in behind a pizza delivery boy. But he presented himself as somebody that the company needed to bargain with, because he was presenting himself as somebody who could control the protests that were going on. He said, you better deal with me, otherwise there's going to be a full-fledged campaign. Now, a full-fledged campaign means something to him. It means, you know, not just having nice little protesters, you know, stand outside your door and leaflet. It means being engaged in illegal conduct. Again, direct action is probably the most important concept here, because that's what Shaq embraced. And direct action has a meaning to the animal rights community. It means breaking into labs and rescuing animals, and it means things like economic sabotage and breaking the law in order to get this done. And a lot of the animal rights organizations crown on this, obviously. Most of them do. And so when you, again, go through the Shaq literature on their website and in their newsletters, they sometimes ridicule the other organizations, and they say, they're not really animal rights groups. You know, they've sold out. They're not willing to take a stand. We are. We embrace direct action. And they warn people on the website when they try to recruit them to take part in the campaign, the electronic civil disobedience, they say, just remember, ECD is against the law. Only do this if you're willing to face the legal consequences and go to jail as Martin Luther King did. But they're the ones promoting it. They're the ones who are saying this is what you should be doing, and they're the ones who, in their individual capacity, clearly seem to be embracing it. I mean, Harper goes to a school in Washington, I believe it was, and gives a speech saying, I'm here to talk about how not to get caught. And he extols how to make black faxes, how to do them, how to, you know. And these are provided on the Shaq website. All the tools that you need to conduct a black fax are provided there. Now, I know that under the statute, one of the arguments has been that we interpreted it too broadly. I mean, we did have two theories going before the jury in terms of this notion of physical disruption. We said, on the one hand, they wanted to put HLS out of business entirely. And on the other hand, they also actually caused property damage and destruction in excess of $10,000. Now, on the second theory, clearly the evidence was sufficient. I mean, we had Mr. Michelson testify, largely undisputed, that there was $15,000 in damage done to the computers. They took down the website. That's obviously a physical disruption to the business, and they had to replace the equipment because it couldn't do the function that they needed to do because it was so vulnerable to this attack. So, clearly, that satisfies the statute in and of itself. If, for some reason, the court were to conclude that we shoehorned more in here than we didn't, then we were entitled to. I think the court can also look to the Supreme Court recently held, I guess just last month, in cases Hedgepeth versus Polito that is no longer a per se reversal if jury instructions are incorrect, that you get to conduct a harmless error argument, even if there are two theories presented, one of which is invalid and one is valid. We argued both to the jury. We had sufficient evidence for both. But if they say there was some problem with the instruction, you can still do harmless error. And when you're doing a harmless error argument in this case, I would suggest that it should be approached the way the trial was approached, which was this case was never fought on the basis of what actually happened, by and large. Everyone admitted that these bad things happened, and everyone was saying it's somebody else's fault. But the fact that there was property destruction at HLS wasn't seriously contested. Would you move to count six in the argument that was raised about the jury instructions broadening the scope of the charge? First of all, the most important thing I would say is there was no challenge to the jury instruction, and there was no challenge to the closing argument. So this is all an appellate, you know, plain error issue that's being – and Peter will correct me if I'm wrong, but this was not an objection to anything that happened at trial. I don't doubt that they considered it a black fax conspiracy, but the indictment as written isn't limited in its scope. The fact that it says, and, you know, uses the singular term, that's how we would always charge something. We don't want to say that we have to charge multiple things in a telecommunications device. I think the government's theory of the case was that faxes and telephones are indistinguishable. I mean, you know, a fax uses the telephone line. A telephone, you know, I actually talked to the prosecutor about this afterwards. I asked him, and that's what he said. I never distinguished in my own mind between faxes and telephones. And when I argued to the jury, I argued both, and nobody objected, and, you know, that's what we did. Now, it is certainly true that if you look at just the substantive acts in that count, it talks only about the black faxes. I don't think this was a focus, you know, I don't think this new issue that Peter has raised was something that the jury, I don't want to predict what the jury focused on, but if everybody at trial saw it as a black fax conspiracy, then probably that's what the jury did as well. But it was, you know, again, it just wasn't the thrust of what was going on in count six. And, again, it should be subject to, under plain error review, you know, the kind of, I would say, fairly minimal scrutiny here. I mean, sometimes it's easy to sort of come, you know, after the fact and sort of might, you know, reanalyze something that nobody considered was important at trial, and this was really among them. Again, this case was fought on the battleground of should we be held responsible for what other people purportedly are doing. And I think the evidence was really pretty overwhelming that as much as they tried to disclaim responsibility by attributing things to anonymous sources, this was their scheme. And they individually embraced it. And you would have to, I mean, some of it is hard to sort of put into a capsule. I mean, the jury heard, you know, lots of conversations by Kijonas and Gazzola and the leadership of the organization. And over the course of those calls, you get a sense of where they stand in the organization, who the leaders are, and who the followers are. And they would constantly go to Kijonas and Gazzola in order to, you know, when any decision had to be made, so to try to parse out what they did on any occasion. In fact, there's an important conversation where Kijonas says he's talking about some civil suits that are against him, and he says it's important for me to be able to say when I am under deposition that I didn't attend any of those rallies. I don't know, you know, I don't know anything about them. There's a lot of plausible deniability going on here. But when you see that they're using aliases when they, you know, when they make some of these statements, they don't identify themselves when they're on the website. They identify themselves as, you know, a New York activist, or they clearly know who they themselves are. There's obviously a lot going on here. And I'm happy to address any other specific questions the court has and try not to ramble on if there's more. Mr. Moore-Marco, thank you very much. Thank you. And we have Mr. Goldberg. I think we just heard an oral argument that shows that the United States still embraces the theory of this case, which is a complete misunderstanding of the robustness, the breadth, the strength of the First Amendment. You cannot understand the sufficiency of the evidence in this case on any count if you do not understand the scope of the First Amendment protection that's involved. Yes, the First Amendment protects those who stand on the sidelines and act nice. Yes, the First Amendment protects those who write books and discuss. But the First Amendment also protects the Ku Klux Klan speaker on the stand who says, we should kill the niggers and the kikes, Brandenburg. The First Amendment also protects the Nazi marcher. The First Amendment protects Lauren Gazzola when she says, we support illegal action. We condone illegal action. This is what I believe, she said. The First Amendment protects that speech. So what do we do when the government then charges a conspiracy or an aiding and abetting count, three conspiracies in this indictment, three or four more abetting and abetting, and says if you support the illegal actions, you are a member of the conspiracy to commit those actions and then guilty of the conspiracy charge. This is the First Amendment problem which was answered by the Supreme Court in 1957 in the Noto case with the strictest jurist doctrine. You don't just send it to the jury, the Supreme Court said, and let the jury figure it out like you do in other criminal cases. The court has to filter at the strictest, the highest level of law, the protection, through jury instructions and then through sufficiency review at the trial and appellate levels. Certainly the First Amendment protects those who say there are people who do this, and that is illegal, and it is a form of civil disobedience, and if you do it, you will be punished if you get caught and you may go to jail, and that's part of our campaign too. And yet I heard the government just say that that was not protected speech to say if you do this, it is a crime and we will support you if you do it. That's not outside the First Amendment to say it. It is outside the First Amendment to do it. It is outside the First Amendment to conspire or to aid and abet with the person who does it, but it must be very close to the actual act. Brandenburg, you need incitement in the very imminent sense. These defendants, yes, they were conscious of where their constitutional rights were, and they went very near the line. They were not nice. They did not stand on the sidelines, but they stood on the First Amendment, and they should have been safe in doing so. Did they not give their name sometimes? Yeah, true. Did they use encryption? Yes. Why? Because they were afraid the government did not understand the First Amendment and that they could be prosecuted and they could be sitting in prison, as they are today, for acts which are not crimes, not crime under the statute and not a crime under the First Amendment if it does come within the statute. When you look at the sufficiency of the animal enterprise count in this whole hour so far, we have not heard the elements of this crime described correctly yet. Please look at the 2002 offense statute carefully. There are three separate elements. Three, not two. An intent, travel in interstate commerce with the intent, let me just finish this thought, with the intent to cause physical disruption. There is no requirement under even a substantive violation of the statute, not that one was charged, that anyone ever cause physical disruption. There is no element in this crime of causing physical disruption. It's an intent element. That's the intent with which the travel is done. Second, that the person intentionally cause damage to or loss of property which is used by the enterprise. That's the action element. Intentionally cause damage or loss of property used. Overloading a computer system, which does not cause the computer system to burn or break, but causes it to fail in the sense of shutting down because it can't handle the problem. And why was the computer out of service? Not because it didn't work, but because it didn't keep intruders out. They didn't have enough software of the right kind on the computer, and they didn't want to start it up until they did. We just heard that admitted. But that was their theory of damage. That's not damage. That's saying I left my door unlocked, somebody walked into my house, and I was out.